Diana **HIRSCHFELD,**
Plaintiff–Appellant,

v.

**NEW MEXICO CORRECTIONS DE-PARTMENT, Michael Francke, in his official capacity as Secretary of the New Mexico Corrections Department, and Dareld Kerby, in his capacity as Warden of the Central New Mexico Correctional Facility, Defendants–Appellees.**

No. 88–2397.

United States Court of Appeals,
Tenth Circuit.

Oct. 12, 1990.

---

E. Justin Pennington, Albuquerque, N.M., for plaintiff-appellant.

Michael Dickman, Asst. Atty. Gen., N.M. (Hal Stratton, Atty. Gen., N.M., Sante Fe, N.M., with him on the brief), for defendants-appellees.

Before HOLLOWAY, Chief Judge, ANDERSON and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiff-appellant Diana Hirschfeld filed an action against defendants under Title VII of the Civil Rights Act of 1964, alleging that she was the victim of gender-based discrimination, retaliation for complaints of sexual harassment which she had filed, and constructive discharge from her employment with the New Mexico Corrections Department. After a bench trial, the court entered final judgment in favor of defendants and dismissed plaintiff's complaint. Plaintiff appeals from that judgment. We affirm. In addition, appellees have moved for sanctions, damages or excessive costs, arguing that plaintiff's appeal of the district court's dismissal of her constructive discharge claim was frivolous and fraught with misrepresentations. We decline to sanction plaintiff's counsel.

## I. BACKGROUND

In March 1984, plaintiff accepted a position as a typist at the Central New Mexico Correctional Facility ("CNMCF"), a medium security prison located in Los Lunas, New Mexico. In August 1984, plaintiff began working for four staff psychologists at CNMCF. Plaintiff worked in "H Building," a structure without a permanent security guard located within the prison compound and accessible to the inmate population during office hours.

Plaintiff's immediate supervisor was Dr. Barbara Schwartz, the Director of Mental Health at CNMCF, who in turn reported to the State Director of Mental Health Services. That director reported to the State Director of Health Services, who in turn reported to defendant-appellee Michael Francke, the Secretary of the New Mexico Corrections Department ("the Department").

In early 1985, an inmate was discovered on three different occasions "hiding and watching plaintiff from a dark empty room across from her office." Dist.Ct.Op. at 5. In January 1985, the officials at CNMCF received an anonymous letter detailing a planned rape of plaintiff. The inmate who had been discovered surreptitiously observing plaintiff was determined to be the inmate referred to in the anonymous letter. He was placed in administrative detention until his release, and no further difficulties were reported. Following receipt of the anonymous letter, plaintiff was reassigned

to a secure area of the prison until a temporary guard was assigned to H Building.

The sexual threats from inmates ceased, a temporary guard was placed on duty in H Building, and plaintiff resumed work in the structure. The next month, however, plaintiff became the target of sexual harassment by a correctional officer, Captain Danny Galvan. On February 11 and 12, 1985, Galvan approached plaintiff while she was working in H Building and hugged her. "He either attempted to kiss her or actually kissed her on these occasions." Dist.Ct.Op. at 6. Plaintiff did not solicit or welcome Galvan's advances and, on February 13, 1985, plaintiff complained to Associate Warden Sanchez. Associate Warden Sanchez told plaintiff that Captain Galvan was away for the day, but that he would speak with Galvan the next day. However, before Associate Warden Sanchez spoke to Captain Galvan about plaintiff's complaint, another incident occurred.

The incident occurred on February 14, after a prison staff meeting. At that meeting, Galvan was informed that the removal of the newly assigned temporary guard from H Building had been ordered in order to strengthen security in other parts of CNMCF. Shortly after the meeting, Galvan approached plaintiff and informed her of the decision to remove the guard. As he left her office, Galvan kissed her and wished her a "Happy Valentine's Day." Dist.Ct.Op. at 6. Plaintiff did not solicit or otherwise welcome the kiss by Galvan. *Id.*

Plaintiff immediately complained of Galvan's conduct to her supervisor, Dr. Barbara Schwartz. Plaintiff and Schwartz then complained directly to Warden Kerby. Kerby interviewed plaintiff and asked her to submit a written statement detailing the incident. Later that evening, Galvan was placed on administrative leave pending the completion of an investigation of the incident.

Instead of submitting a written statement, plaintiff filed a formal grievance. On February 15, Kerby spoke with Galvan and arranged for a formal interview on February 19. During that interview, Galvan admitted hugging plaintiff on February 11 and 12, and kissing her on February 14. He also admitted harassing another female employee at CNMCF. Plaintiff was also interviewed on February 19. All of the interviews were tape recorded and transcribed. According to the district court, "[s]ubsequently, the tapes were mixed up and thought to be inadvertently erased." Dist.Ct.Op. at 7.

On February 22, Warden Kerby informed Galvan of his decision to demote him from Captain to Lieutenant. Warden Kerby twice declined Galvan's request that he change his decision. The demotion became effective on March 23, 1985. Following the demotion, there were no more reported incidents of sexual harassment of plaintiff by Galvan.

Galvan appealed his demotion to the New Mexico State Personnel Board. Although the district court found that "the contents of the transcripts of the missing tapes were never in dispute," *see* Dist.Ct.Op. at 7, the Personnel Board considered the loss of the tapes a failure in "bad faith" by the Department of Corrections to comply with certain discovery orders. As a result, the Personnel Board ruled that Galvan's demotion was invalid, and he was reinstated to the position of Captain.

Following the filing of her formal grievance, plaintiff became the subject of numerous rumors. The district court found, however, that "[r]umors were a natural result of curiosity in a closed community such as the Facility. In fact, almost every witness testified that rumors were common about everybody. They did not single plaintiff out." Dist.Ct.Op. at 23–24. Plaintiff also received several obscene telephone calls from unidentified persons at her home after filing the grievance against Captain Galvan.

Plaintiff left work on June 14, 1985. She was diagnosed as having tonsillitis and a bladder infection. She never returned to work at CNMCF. On June 27, 1985, plaintiff began seeing Dr. Charles Bright, a psychiatrist. Dr. Bright determined that plaintiff suffered from clinical depression. In January 1986, plaintiff was admitted to a psychiatric hospital for a brief period.

Plaintiff subsequently filed this action against the New Mexico Corrections Department, and both the Secretary of the Corrections Department and the Warden of CNMCF in their official capacities. Plaintiff claimed sexual harassment by Captain Galvan and other employees [1] and inmates, as well as retaliation when she protested the harassment and constructive discharge, all allegedly in violation of Title VII of the Civil Rights Act of 1964, as amended. Plaintiff requested declaratory and injunctive relief, back pay, and reinstatement.

After a bench trial, the district court concluded that Captain Galvan's conduct, in combination with the incident of sexual harassment by an inmate, constituted sexual harassment which gave rise to an intimidating and offensive work environment. However, the court concluded that the Department of Corrections and the other two named defendants were not liable for the harassment. The court found that although Galvan was not a supervisor of plaintiff, he was an agent of the Corrections Department. Ultimately, the court declined to impose liability under an agency theory, concluding that Galvan's sexual harassment was not sufficiently aided by his agency relationship with the Corrections Department, and that the remedial action taken by the Corrections Department was "prompt, adequate and effective." Dist.Ct.Op. at 20.

The district court also rejected plaintiff's claim of retaliation.[2] In addition, the district court rejected plaintiff's constructive discharge claim, concluding that the evidence linking her depression to the sexual harassment was "not convincing" and that "a reasonable person in plaintiff's position would not have felt compelled to resign under the circumstances." Dist.Ct.Op. at 25.

On appeal, plaintiff challenges the district court's dismissal of her sexual harassment and constructive discharge claims. We affirm. Additionally, defendants have requested various sanctions against plaintiff's counsel for making an allegedly frivolous appeal and for misrepresentation therein. We decline such an invitation.

## II. DISCUSSION

### A. Hostile Work Environment Sexual Harassment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Congress defined "employer" as a "person engaged in an industry affecting commerce ... *and any agent of such a person.*" 42 U.S.C. § 2000e(b) (emphasis added).

The courts have interpreted Title VII to prohibit two types of sexual harassment: quid pro quo sexual harassment and hostile work environment sexual harassment. Quid pro quo sexual harassment involves the conditioning of tangible employment benefits upon the submission to sexual conduct. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987). Hostile work environment harassment occurs "where '[sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(a)(3)). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct.

---

1. Although plaintiff's complaint alleges that there were unidentified multiple harassers, all of the evidence presented was directed at the actions of Captain Galvan.

2. Because plaintiff has withdrawn that portion of her appeal challenging the district court's unfavorable retaliation ruling, we do not address that conclusion of the district court or the factual allegations made by plaintiff in support of that claim. *See* Notice of Partial Withdrawal of Appeal (filed February 7, 1989).

at 2405 (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir.1982)).

The district court found that Captain Galvan's conduct constituted hostile work environment sexual harassment. Because neither party appeals that determination, the only question is whether the district court correctly concluded that the defendants are not liable for Captain Galvan's conduct.

### B. *Employer Liability*

The Supreme Court has considered the question of employer liability for hostile work environment sexual harassment and has partially clarified the issue. In *Meritor*, the Court declined "the parties' invitation to issue a definitive rule on employer liability," *id.* 477 U.S. at 72, 106 S.Ct. at 2408, but agreed "with the EEOC that Congress wanted courts to look to agency principles for guidance in this area." *Id.* The Court explained that, because Congress' definition of an "employer" included "any 'agent' of an employer, 42 U.S.C. § 2000e(b), [it] surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Id.* Accordingly, the Supreme Court rejected the Court of Appeals' view that "employers are always automatically liable for sexual harassment by their supervisors." *Id.*

In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987), this court followed the Supreme Court's direction in *Meritor* and analyzed a hostile work environment sexual harassment claim in accordance with agency principles. *Id.* at 1417–18. The court in *Hicks* identified three alternative bases for holding an employer liable for an agent's hostile work environment sexual harassment. The court explained that under the *Restatement (Second) of Agency,* "an employer is liable for any tort committed by an employee 'while acting in the scope of ... [his or her] employment.'" *Id.* at 1417 (quoting *Restatement (Second) of Agency* § 219(1) (1958)). The court referred to two other relevant sections of the Restatement, *Id.* at 1418, which provide:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> . . . .
>
> (b) the master was negligent or reckless, or
>
> . . . .
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he [or she] was aided in accomplishing the tort by the existence of the agency relation.

*Restatement (Second) of Agency* § 219(2) (1958).

The district court in this case considered each of the three alternative bases for liability suggested in *Hicks* and held that defendants were not liable for Galvan's sexual harassment of plaintiff. This court is now called upon to apply the principles enunciated in *Hicks*.[3] We shall separately evaluate each of the three potential bases for liability.

### 1. Acting Within the Scope of Employment

■ As noted above, the Restatement provides that an agent is liable for any tort committed by an employee "while acting in the scope of ... [his or her] employment." *Restatement (Second) of Agency* § 219(1) (1958). However, in *Hicks*, this court noted that "§ 219(1) of the Restatement of Agency provides scant assistance in assessing employer liability under Title VII." *Hicks*, 833 F.2d at 1418. The court explained that section 219(1) was largely inapposite in sexual harassment cases because " '[s]exual harassment simply is not within the job description of any supervisor or any other worker in any reputable business.' " *Id.* at 1417–18 (quoting Holtzman & Trelz, *Recent Development in the Law of Sexual Harassment: Abusive Environment Claims after Meritor Savings Bank v. Vinson*, 31 St. Louis U.L.J. 239, 276

---

**3.** In *Hicks,* the court "without expressing any view on the merits of the ultimate determination that should be made on the hostile environment sexual harassment claim ... remanded [the claim] to the district court for reconsideration." *Hicks,* 833 F.2d at 1417.

(1987)). This court further stated that " '[c]onfining liability ... to situations in which a supervisor acted within the scope of his authority conceivably could lead to the ludicrous result that employers would become accountable only if they explicitly require or consciously allow their supervisors to molest women employees.' " *Id.* at 1418 (quoting *Vinson v. Taylor,* 753 F.2d 141, 151 (D.C.Cir.1985), *aff'd in part and rev'd in part sub nom., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

The district court in this case held that Captain Galvan was an agent of the Department, but that the Department was not liable under section 219(1) because he "was not acting within the scope of his employment in his actions toward plaintiff." Dist. Ct.Op. at 18. The record firmly supports the district court's conclusion. Therefore, we find no error in the district court's holding that defendants are not liable for Galvan's actions under section 219(1).

### 2. Employer Negligence or Recklessness

As the court explained in *Hicks,* employer negligence or recklessness in failing to respond to hostile work environment sexual harassment by employees may result in liability. *See Hicks,* 833 F.2d at 1418; *Restatement (Second) of Agency* § 219(2)(b) (1958). Employer negligence in this context is defined as "failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1516 (9th Cir. 1989).[4] All other circuits that have considered the question have utilized this standard. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1486 (3d Cir.1990);

*Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989); *Hall v. Gus Construction Co.,* 842 F.2d 1010, 1015 (8th Cir.1988); *Swentek v. USAir Inc.,* 830 F.2d 552 (4th Cir.1987); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 621 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). *See also Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988) (applying same negligence standard to educational institution liability for hostile work environment sexual harassment action under Title IX).[5]

The district court referred to the *Restatement (Second) of Agency* as directed by *Hicks,* and concluded that section 219(2)(b) "clearly [does] not apply." Dist. Ct.Op. at 18. The court found the following:

> Once informed of plaintiff's complaint against Captain Galvan on February 14, 1985, the warden responded with immediate corrective action. The warden interviewed plaintiff during the lunch hour. That evening Captain Galvan was placed on administrative leave. After a thorough investigation, Captain Galvan was demoted. The demotion was appealed by plaintiff as too lenient and upheld by the Secretary of [the] Corrections Department.

> Plaintiff filed a formal grievance in lieu of the "statement" requested by the warden for his investigation. She testified that she did this because she felt the grievance procedure would not bring results. Plaintiff's doubts that the grievance procedure would have been ineffective (sic) are not supported by the evidence. To the contrary, plaintiff's other grievances had been taken seriously and handled appropriately. Moreover, plaintiff had no further problems with Cap-

---

**4.** This standard has been adopted in part by the EEOC: "[w]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. § 1604.11(d) (1989).

**5.** This negligence standard for employer liability occasionally has been mislabeled as "respondeat superior." In *Hall v. Gus Constr. Co., Inc.,* 842 F.2d at 1015, the Eighth Circuit explained this error, borrowing from *Hunter v. Allis-Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1421 (7th Cir.1986), which clearly articulated the difference between derivative liability for respondeat superior and direct liability for negligence or recklessness.

tain Galvan. The State Personnel Board's ultimate decision to reverse the warden's decision is not attributable to the Corrections Department. The court concludes that the remedial action was prompt, adequate and effective.

Dist.Ct.Op. at 19–20. After reviewing the record, we hold that the district court's factual findings are well-supported and are not clearly erroneous. *See Hacienda Hotel*, 881 F.2d at 1516 (standard of review for district court finding that employer failed to take prompt remedial action once notified of harassment is whether findings are clearly erroneous).

The remedial action taken by the defendants in this case was as effective as that recognized by other circuits which have found no liability under section 219(2)(b). *See, e.g., Steele*, 867 F.2d at 1316; *Swentek*, 830 F.2d at 558–59. *Cf. Davis v. Monsanto Chemical Co.*, 858 F.2d 345 (6th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989).

In *Steele*, the Eleventh Circuit held that an employer was not liable for the hostile work environment sexual harassment of an executive secretary created by its vice president and general manager, Bucknole. *Steele*, 867 F.2d at 1316. The court explained the remedial action taken:

> The corporate employer knew of Bucknole's harassment, and it then took prompt remedial action. The corporate employer sent [a senior manager] to interview the employees; it called Bucknole to New York from Saudi Arabia for a reprimand; and it assured the employees that the harassment would stop. Of special importance, Bucknole's harassment ended after the remedial action. The corporate employer, therefore, is not liable for Bucknole's actions....

*Id.*

In *Swentek*, the Fourth Circuit held that a corporate defendant was not liable for the hostile work environment sexual harassment of a flight attendant created by a pilot. *Swentek*, 830 F.2d at 558–59. A

flight attendant complained of the harassment to the Manager of Flight Attendant Services who, in turn, repeated the complaint to the pilot. *Id.* at 558. The pilot was called in for a conference and confronted with the plaintiff's allegations. *Id.* Although the pilot admitted to engaging in some inappropriate behavior, he denied the most serious of allegations. *Id.* The supervisor credited the denials, and the pilot received a written warning to curb his language and keep away from the plaintiff. *Id.* He was also informed that any further complaints about his language would result in a suspension. *Id.* The corporate defendant, USAir, "then monitored [the pilot's] conduct for improvement. After this reprimand, no further complaints were lodged against him." *Id.* The court affirmed the district court's ruling which had denied plaintiff relief under Title VII, concluding that "[w]hen [plaintiff] complained of harassment, USAIR responded." *Id.*

The course of action taken by the Department in this case was as expeditious and effective as that recognized in *Steele* and *Swentek*. As the district court noted:

> [W]hen plaintiff reported the incidents with inmate Jorgensen and the rape threat, a temporary guard was placed at plaintiff's building, an investigation was conducted by Mr. Sanchez, the inmate was placed in lockup and no further problems were reported. The hostile conduct by inmates, once reported, was dealt with quickly and effectively.

Dist.Ct.Op. at 19. On February 14, after the third harassment by Captain Galvan, plaintiff and her immediate supervisor complained directly to Warden Kerby. Later that evening, Galvan was placed on administrative leave pending the completion of an investigation of the incident. On February 22, Kerby informed Galvan of his decision to demote Galvan from Captain to Lieutenant and that demotion became effective on March 23. Importantly, following the demotion, there were no more reported incidents of Galvan sexually harassing plaintiff.[6] *See* Dist.Ct.Op. at 20.

---

**6.** In her brief, plaintiff argues:

the trial court ignored the New Mexico State Personnel Board's decision reversing Galvan's

### 3. Authority or Agency Relationship Aiding Harasser

In *Hicks,* the court identified section 219(2)(d) of the *Restatement (Second) of Agency* (1958), as a possible basis for employer liability for hostile work environment sexual harassment. That section provides that a master may be liable for the acts of a servant acting outside the scope of delegated authority if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he [or she] was aided in accomplishing the tort by the existence of the agency relation."

The district court held that:

Section 219(2)(d) properly imputes an employee's actions to the employer whose delegation of authority empowered the agent to undertake them. Here, Galvan did not purport to act on behalf of the institution by his inappropriate actions toward plaintiff. The only con-

demotion based on the Department's bad faith finding that the decision was not attributable to the Department.... The issue of the Department's bad faith was fully and finally litigated before the State Personnel Board.... The State Personnel Board's decision that the Corrections Department acted in bad faith in litigating Galvan's demotion is a *final determination* by which the Department is bound as a matter of law.

Appellant's Br. at 13–14 (emphasis in original). In response, appellees contend that because the issue of collateral estoppel was not raised before the district court, "[d]efendants did not present evidence at trial concerning the quality, extensiveness and fairness of the Personnel Board's proceeding nor what was meant by the Board's use of the term 'bad faith.'" Appellee's Br. at 12 (footnote omitted). Our review of the record confirms that plaintiff never raised the issue of collateral estoppel before the district court. Therefore, we hold that plaintiff has waived this issue. *See Harvey by Blankenbaker v. United Transportation Union,* 878 F.2d 1235, 1243 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990).

Although we decline to address plaintiff's collateral estoppel claim for the first time on appeal, even if we concluded that defendants were bound by the Personnel Board's determination that the Department's failure to comply with discovery orders was somehow an act of "bad faith," we would still affirm the district court's conclusion that defendants took prompt, effective remedial action against Galvan. An employer notified that an employee is engaging in hostile work environment sexual harassment is

ceivable way Galvan was aided by the agency relationship in the accomplishment of the tort is that he would not have been there but for his job. This is too broad a reading of 219(2)(d). The second half of 219[(2)](d) which reads "or is aided in accomplishing the tort by the existence of the agency relation,["] must be read in [the] context of what immediately precedes it.

Dist.Ct.Op. at 19. We agree.

Plaintiff presented no evidence suggesting that, as a Captain at CNMCF, Galvan had any supervisory authority over plaintiff's position whatsoever. Indeed, it is clear from the record that plaintiff's supervisor was Dr. Schwartz. Although Galvan had authority over his subordinate security guards, there was no evidence indicating that Galvan ever invoked that authority in order to facilitate his harassment of plaintiff.[7] Accordingly, we affirm the district

not obligated to discharge or demote the harasser in every case. While there may be egregious cases where such action is the only option for an employer, in less serious cases a reprimand, brief suspension, or other remedial steps may be sufficient to remedy the situation. *See Steele,* 867 F.2d at 1316 (reprimand of harasser and assuring employees harassment would stop constituted *prompt remedial action); Swentek,* 830 F.2d at 558 (letter of warning, verbal reprimand, and threat that employee would be suspended if further complaints were filed constituted prompt and adequate remedial action). The defendants' actions here constituted prompt, adequate, and effective remedial action irrespective of the Personnel Board's decision to reverse the demotion based on its conclusion that the Department acted in "bad faith."

7. As a Captain, Galvan did have very limited, non-supervisory authority over plaintiff concerning security matters when he was the highest ranking officer present at the facility. *See* Dist.Ct.Op. at 18, n. 5. Captain Galvan had no supervisory authority to hire or fire persons working for Mental Health Services, and he had no authority to determine plaintiff's work assignments. However, when the Warden, Deputy Warden, Associate Warden, and Major were all absent from CNMCF, Captain Galvan served as "Acting Warden" with authority over the entire facility, including Mental Health Services, concerning security matters. In that capacity, Galvan would have been authorized to take disciplinary action against plaintiff for breaching security. However, there was no evidence presented at trial suggesting that Captain Galvan

court's ruling that defendants are not liable for Galvan's harassment of plaintiff under section 219(2)(d).

## C. Constructive Discharge

"Constructive discharge is a fact question subject to the clearly erroneous standard of review." *Steele*, 867 F.2d at 1317. " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* 470 U.S. at 574, 105 S.Ct. at 1511.

The test for a constructive discharge claim brought under Title VII is "whether a reasonable person would view the working conditions as intolerable." *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 (10th Cir.1986) (quotations, brackets and footnote omitted). The district court applied that standard and found:

> The sexual harassment occurred February 11–14, 1985. After her complaints regarding the unwelcome sexual advances were communicated to Captain Galvan by the warden, he never confronted plaintiff again. The Court has found no illegal retaliatory discrimination. A full four months after the last incident with Captain Galvan, plaintiff left work physically ill with tonsillitis and a bladder infection and mentally depressed. *The evidence linking her depressed state to the sexual harassment months prior was not convincing.* While plaintiff may have been disturbed by rumors con-

cerning her, the Court concludes that a reasonable person in plaintiff's position would not have felt compelled to resign under the circumstances. Therefore, plaintiff was not constructively discharged.

Dist.Ct.Op. at 24–25 (emphasis added).[8] After thoroughly reviewing the record, we are satisfied that the district court's ruling is not clearly erroneous.

Plaintiff maintains that she presented "uncontroverted" evidence "that other female employees in the same position would have resigned immediately." Appellant's Br. at 20. Plaintiff also contends that the court ignored "competent and uncontroverted testimony linking Hirschfeld's depressed state to the harassment and subsequent retaliation she suffered pursuant to her employment with Defendants.... Dr. Bright's testimony establishes the causal relationship between Hirschfeld's work environment and her medical depression was competent and absolutely uncontroverted, and cannot be ignored." *Id.* at 20–21.[9]

The district court's opinion amply demonstrates that the testimony was not ignored. Rather, the court simply was not convinced by plaintiff's evidence. Plaintiff bears the burden of proving she was constructively discharged by a preponderance of credible evidence; mere uncontroverted evidence, if not credible, is insufficient. *Cf. Parrilla–Lopez v. U.S.*, 841 F.2d 16, 19 (1st Cir.1988) (even if expert testimony is uncontradicted, district court not required to accept the testimony as true if it is not credible). After reviewing the record, we find that the district court's determination that plaintiff's evidence was not credible is not clearly erroneous. *Cf. United States v. Erickson*, 732 F.2d 788, 790 (10th Cir.1984) (appellate court is bound by trial court's determination that testimony was not credible

as Acting Warden ever took, or threatened to take, disciplinary action against plaintiff. The mere delegation of non-supervisory authority to Captain Galvan does not give rise to employer liability under section 219(2)(d).

**8.** Because plaintiff has withdrawn that portion of her brief appealing the district court's determination that there was no illegal retaliatory

discrimination, we accept that determination as final to the extent that the district court relied upon it in rejecting plaintiff's constructive discharge claim. *See* note 2, *supra*.

**9.** Plaintiff's descriptions of the evidence as "uncontroverted" form the basis for appellees' motion for sanctions which is discussed in the next subsection.

unless clearly erroneous). Therefore, we affirm the district court's dismissal of plaintiff's constructive discharge claim.

### D. *Motion For Sanctions*

■ On February 6, 1989, appellees moved for sanctions, damages or excess costs, arguing that plaintiff's appeal of her unsuccessful constructive discharge claim was "frivolous" and that plaintiff's counsel misrepresented to this court that the above evidence was "uncontroverted" or "not controverted." We have reviewed the record and decline to sanction plaintiff's counsel under either 28 U.S.C. § 1927 or Federal Rule of Appellate Procedure 38. We believe the manner in which plaintiff's counsel characterized the evidence does not constitute the type of "conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) (en banc).

Plaintiff's counsel characterized as "uncontroverted" the testimony of certain female co-workers that they would have "resigned immediately" under the circumstances experienced by the plaintiff. In a technical sense, that description is not inaccurate. The record contains no testimony directly contradicting the female co-workers' testimony that they would have resigned immediately under the circumstances of this case. However, there was sufficient evidence presented upon which the district court could have concluded that a reasonable person would not have found plaintiff's situation so intolerable as to warrant immediate resignation. Nevertheless, in the absence of *directly* contradictory testimony, we are reluctant to sanction

counsel's cavalier use of the term "uncontroverted."

However, the description of Dr. Bright's testimony by plaintiff's counsel as "absolutely uncontroverted" is more troubling. *See* Appellant's Br. at 21. Dr. Bright testified that the work environment "precipitated" plaintiff's severe depression. There was evidence introduced which substantially undermines that conclusion. Once again, however, giving the term "uncontroverted" a narrow and technical construction, plaintiff's description of the evidence is not sufficiently misleading to justify sanctions.

The Psychiatric Examination Report prepared by Dr. Michael Dempsey concluded that "it is very *unlikely* that [plaintiff's] work experiences had made any contribution to her mood swing symptomatology." *See* Defendants' Exhibit W (emphasis added). Likewise, Dr. R.E. Brubaker examined plaintiff on June 17, 1985, three days after she discontinued work, and concluded "I see no reasoning (sic) for her making a claim for workmen (sic) compensation on the one time that I saw her." *See* Defendant's Exhibit HH.[10] Although those diagnoses conflict with Dr. Bright's evaluation of plaintiff's condition, neither doctor affirmatively stated that plaintiff's work environment did not (or could not) have precipitated her condition.

Other conflicting evidence presented at trial includes the testimony of Carl Olona, an inmate at CNMCF during the time plaintiff worked there. Mr. Olona and his mother both testified that he had had a relationship with plaintiff and coached her on how to dress and act in order to convince Dr. Bright that she was suffering from work-related depression. *See* Exhibit ZZ at 15, 17; R.Vol. IV at 689.[11] While that testimo-

---

**10.** Appellant argues that Exhibits W and HH are "hearsay medical opinions completely lacking proper foundation." Appellant's Reply Br. at 12. Our review of the record disclosed no hearsay objection to the admission of Defendant's Exhibit W. However, appellant did object to Exhibit HH as hearsay. *See* R.Vol. II at 4; R.Vol. IV at 594. It is unclear from the record whether the district court ever ruled on that objection, although remarks by appellant's counsel suggest that Exhibit HH was in fact

admitted at some point. *See* R.Vol. 4 at 594. In any event, because the testimony was cumulative and corroborative of other evidence on the same point, we need not decide whether the testimony was inadmissible hearsay or within an exception to the hearsay rule. *See Dixson v. Newsweek*, 562 F.2d 626, 632 (10th Cir.1977).

**11.** Plaintiff argues that the Olonas' testimony was "incompetent lay opinion" testimony on the issue of medical causation. Appellants' Reply Br. at 12. That argument is without merit. The

ny may not squarely controvert Dr. Bright's testimony, if credited, it certainly calls into question the validity of his conclusions.

Because the testimony of Dr. Brubaker, Dr. Dempsey, and the Olonas does not directly controvert Dr. Bright's testimony, we cannot conclude that the characterization by counsel for plaintiff of Dr. Bright's testimony as "absolutely uncontroverted" is the type of misrepresentation meriting sanctions. We note, however, that the questionable use of the term "uncontroverted" by counsel for plaintiff did nothing to further plaintiff's arguments, and we expect a higher level of candor and accuracy from counsel in the future.

## III. CONCLUSION

The district court's decision that defendants are not liable for the hostile work environment sexual harassment of plaintiff by Captain Galvan is AFFIRMED. The district court's decision that plaintiff failed to prove she was constructively discharged as a result of the hostile work environment sexual harassment is AFFIRMED. Appellees' motion for sanctions is DENIED.

record clearly shows that the Olonas' testimony was offered solely for the purpose of discrediting the foundation of Dr. Bright's diagnosis, and not as a contrary professional opinion.