**Victoria Lynn HANSEL, Plaintiff,**

v.

**PUBLIC SERVICE COMPANY OF COLORADO, Defendant.**

**Civ. A. No. 88–B–853.**

United States District Court, D. Colorado.

Dec. 11, 1991.

James A. Carleo, Colorado Springs, Colo., for plaintiff.

David W. Kerber, Salie B. O'Malley, Kelly, Stansfield & O'Donnell, Denver, Colo., for defendant.

FINDINGS OF FACT AND
CONCLUSIONS OF
LAW

BABCOCK, District Judge.

This Title VII action was tried to the court for four days beginning on Novem-

ber 15, 1991. Although plaintiff alleged both sexual harassment and disparate treatment, the case was tried principally on plaintiff's claim of sexual harassment. My findings and conclusions follow.

## I.

### FINDINGS OF FACT

Plaintiff Victoria Lynn Hansel (Hansel) lives in Pueblo, Colorado. She brought this action in June 1988 against Public Service Company of Colorado (PSC) alleging that defendant maintained and failed to correct a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* Hansel had previously filed a similar complaint with the EEOC in December, 1987.

Hansel was hired in March, 1980 as an auxiliary tender in the operations department of the Comanche Power Plant in Pueblo, Colorado. The job of auxiliary tender is the entry level position in plant operations and requires employees to operate and maintain various machinery. The plant employs a total of 13 to 14 auxiliary tenders at any one time. It operates on three shifts a day and there are three auxiliary tenders assigned to each shift.

When Hansel was hired, there was only one other woman employed as an auxiliary tender and there were no women in higher job categories within the operations department. Because all the operations employees are required to work rotating shifts, Hansel was often the only woman working in the plant during her shift.

From 1980 to 1988, six other women were hired as auxiliary tenders at the plant. None of these women is still employed within the operations department at Comanche. Under prevailing union seniority rules, no woman, including Hansel, in the operations department at Comanche has ever progressed to the position of equipment operator, which is the next job level above auxiliary tender. Hansel satisfactorily performed her job throughout her employment at Comanche.

On Hansel's first day of work in 1980, Frank Roitsch, the plant manager for PSC, told her that "I can't begin to prepare you for what you're in for." Hansel took this to mean that Roitsch expected her to have problems because of her gender as she replied "I've worked around men my whole life." Roitsch did not then respond.

As with all new hires, Hansel was placed on a 120 day training and probation period. She satisfactorily completed her training, and on her 121st day, she was given her "white helmet." On that day, one of her male co-workers hit her over the head with a crescent wrench with such force that Hansel's helmet was dented. He told her that this was her "initiation." New employees were often subjected to this initiation. However, their helmets were not on their heads when the helmet was struck.

After Hansel's probation, her co-workers began a continuous and concerted campaign of sexual harassment and discrimination intended to force her out of plant operations, previously an all-male environment. The campaign, though continuous, manifested itself in two phases: 1980 to May, 1983 and June, 1983 to June, 1988, when she filed this action. The incidents chronicled below took place between the end of Hansel's probation and May 10, 1983. Because of the lapse of time, plaintiff could not provide precise dates.

When Hansel asked a co-worker a job-related question, he replied to her "I have something you want, you have something I want."

When Hansel was working by herself, a co-worker had hidden himself in the shadows above and behind her. He dropped a large bolt that nearly hit her head.

Hansel was slapped on her buttocks on more than 10 occasions by more than five different co-workers. This conduct often occurred in front of other workers, who laughed at Hansel's attempts to stop this conduct.

On at least three occasions, different co-workers grabbed and fondled Hansel's breasts. On one of these occasions, Hansel's arms were held while another co-worker assaulted her.

When Hansel came into work one day with an Ace bandage on her wrist, she was greeted with the comment "Out fucking dogs all night and one bit you." This comment was made in the break room, in front of several co-workers.

After accepting a ride from two co-workers, Hansel was held down by one in the front seat of the car while the other sexually assaulted her by fondling her genitals.

While her car was parked in the employee parking lot, Hansel's windshield was broken twice and a side window broken once. She often found "spit" on her windshield.

Hansel's work gloves were a focus of this harassment. Once, they were filled with bathroom cleaner. Another time, they were filled with sunflower seed shells. At yet another time, her gloves were filled with lime powder. The employee who filled her gloves with bathroom cleaner later apologized and bought Hansel a new pair of gloves.

Hansel came out of a stall in the ladies room one day to find a male co-worker in the bathroom holding a hangman's noose. He told her it would be better if she just killed herself.

At another time, two male co-workers came into the ladies room and asked Hansel if she needed any help.

One day, Hansel came back to the desk used by auxiliary tenders to find one of her used tampax placed over the nozzle of a spray bottle.

There was sexually explicit graffiti throughout the plant, some of which was explicitly directed at Hansel.

Generally, Hansel was continually insulted and made to feel "stupid" by her co-workers.

Hansel did not report the majority of these incidents to her supervisors. However, she reported the broken windshields and one incident concerning her gloves. Hansel felt that if she reported the harassment it would only get worse. She thought that if she kept quiet her co-workers would eventually accept her and the harassment would stop.

The harassment severely affected Hansel's work and personal life. She was afraid to ask job-related questions. She found it hard to concentrate on her tasks. She felt continually fearful and threatened at work. She never knew when the next incident would occur. She even considered suicide during this period.

During her annual performance review in 1982, Hansel told her supervisor, Mr. North, that she was having problems with sexual harassment. However, she refused to provide him with names and specific details, fearing retaliation. North told her that nothing could be done unless she came forward with that information. He also told her to "work on your peer relations" and to try to "fit in better."

Again at her performance review in January, 1983 with her supervisor, Walt O'Hara, she complained of sexual harassment, but refused to provide him with names and specific details. Hansel felt that she would lose her job if she provided this information. At this meeting, Hansel became hysterical and was hospitalized later that day for a nervous breakdown. She returned to work a month later, where she was then ridiculed as a "mental case", despite management's promise to keep the nature of her hospitalization confidential.

After talking with her union representative, Hansel requested a meeting with plant management to file charges of sexual harassment. At that meeting on May 10, 1983, Hansel identified six co-workers and set out the specifics of many of the incidents detailed above.

In response to Hansel's charges, Roitsch and other management at the plant discussed the allegations with four of the six workers identified by Hansel. These men denied her charges and were never formally disciplined. In notes dated May 12, 1983, Roitsch indicated that he would discuss sexual harassment generally with his supervisors, although it is unclear whether this discussion ever took place. In those notes, Roitsch listed four ways for Hansel to respond to the sexual harassment:

1. Get help from Supv. Supt. or Manager immediately
2. Thin skinned about words
3. Tries too hard to be liked
4. Develop coping techniques
 a. replies
 b. belt knife or 10″ crescent
 c. Other gals discuss—support group

PSC took no other remedial action in 1983.

The sexual harassment did not end after Hansel filed these charges. The overt, physical harassment declined, but the hostile and abusive work environment continued, manifesting itself in different ways.

After the May 10 meeting, Hansel was told by one co-worker that she had "really screwed up" and that from then on it would be "total isolation." During the next year, Hansel was shunned and ostracized by her co-workers.

After 1983, the sexually explicit graffiti at the plant intensified. Much of this graffiti was directed at Hansel by name. For example, one graffiti read "V.H. sucks all cocks." Another said "Dog Face Hansel." Yet another depicted the lower half of a female body with the words "Shot cunt V.H." written over it and "Sweet Lips" written underneath. Plant management knew of the graffiti, and, although some of it was removed by management, much of it remained on the walls at the plant for months and even years. The sexually explicit graffiti was prevalent throughout the period of Hansel's active employment at the plant.

There were also pornographic and sexually explicit magazines, pin-ups, and calendars at the plant. On at least two occasions, this material was left where Hansel would find it. This kind of material was prevalent throughout the plant from 1980 until 1988–89.

After 1983, cartoons began appearing on the bulletin boards disparaging Hansel. For example, a sign posted in the control room in the summer of 1987 read: "SEXUAL HARASSMENT IN THIS AREA WILL NOT BE REPORTED HOWEVER, IT WILL BE GRADED." One of PSC's own policy statements dated October 2, 1987 on equal employment opportunity was altered to read that sexual advances were "welcome."

During her performance reviews in 1985, 1986 and 1987, Hansel was told by her supervisor that women should not be in power plants and that women are not mechanically inclined.

PSC had a company policy forbidding sexual harassment from at least 1985. The policy statement was contained in all employee manuals and was posted at each workplace. PSC began voluntary equal employment opportunity (EEO) training classes for management personnel in 1986. However, PSC had no effective means to monitor whether there was a sexually hostile work environment at any of its plants. PSC would act on specific complaints, but it took no proactive measures, aside from posting policy statements and holding voluntary management and worker education classes.

In November, 1987, PSC required all employees at Comanche to attend a "pluralism" class that, in part, addressed issues of sexual harassment. After that class, the plant manager, Virgil Wetzbarger, issued a memo on November 24, 1987 reaffirming PSC's EEO policy and specifically setting out examples of sexual harassment. Wetzbarger admitted that there was a problem at that time with sexually explicit graffiti and obscene materials. Beginning in 1987–88, plant management began to remove some of the sexually explicit graffiti and obscene materials. However, they did not make significant progress in this regard at Comanche until 1990.

A June 17, 1988 memo on women in nontraditional positions issued by PSC's EEO unit tracked the very problems Hansel had experienced at Comanche. For example, the memo stated "A woman is 'tossed out' on the job alone; (men) can then get rid of women one by one." However, management at Comanche took no effective action after receiving this memo.

PSC never effectively disciplined or terminated any of the male co-workers who were subjecting Hansel to the sexual harassment.

Hansel suffered a job related injury at the plant on July 13, 1990. She returned to light duty for a few weeks in August, but since then she has not been released by her physician to return to work. She did not establish when she stopped receiving her salary. However, to the date of trial, Hansel continues to receive her employee benefits and she is carried on the personnel roster as an employee on "no-time" status.

Hansel was never denied a promotion or the opportunity to train for a promotion because of her sex. However, she feared taking on-the-job training for the equipment operator position because the trainers were some of the men who had subjected her to sexual harassment.

Hansel's treating psychologist, Dr. Aldrich, and expert witness, Dr. Ricci, agree that Hansel is suffering from post traumatic stress disorder. Both psychologists believe that it would be detrimental to plaintiff's mental health to return to work at Comanche, because many of the men who harassed plaintiff are still employed at the plant and some of them would now supervise her.

Evidence was admitted that Hansel was paid approximately $29,000 a year and received benefits worth $12,412 a year. PSC introduced no evidence on whether plaintiff fulfilled her duty to mitigate her damages with respect to either back pay or front pay.

I find that from 1980 to 1988 Hansel was subjected to sexual harassment that was so severe and pervasive as to alter the conditions of her employment and create an abusive and hostile work environment. Although its form evolved over time, the sexual harassment and the resulting hostile environment were continuous and systematic.

Further, I find that as early as 1980 PSC knew that women at the Comanche power plant in general were subjected to a hostile working environment. By 1983 at the latest, PSC had actual knowledge that Hansel was subjected to a sexually hostile and abusive work environment. Even absent actual knowledge, PSC clearly should have known of the sexual harassment.

Further, I find that from 1980 to 1988 PSC failed to take prompt, effective or appropriate action to correct this hostile work environment.

## II.

## CONCLUSIONS OF LAW

### A. LIABILITY

 Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e)–2(a)(1). A claim of "hostile environment" sexual harassment is actionable under Title VII. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

 To establish a claim against an employer for a hostile work environment, a plaintiff must show that:

1. plaintiff belongs to a protected group;

2. plaintiff was subject to unwelcomed sexual harassment;

3. the harassment was based on plaintiff's sex;

4. the harassment was so pervasive that it altered the conditions of plaintiff's employment and created a hostile work environment; and,

5. the employer is liable upon applicable agency principles; viz, that the employer knew of or should have known of the harassment and failed to take proper remedial action. *Meritor Savings Bank, supra; Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987); *Sahs v. Amarillo Equity Investors, Inc.*, 702 F.Supp. 256 (D.Colo. 1988). I conclude that Hansel has met her burden of proving each requisite element of her claim.

 Hostile work environment arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating

an intimidating, hostile, or offensive work environment. *Meritor Savings Bank, supra.* Acts underlying a hostile environment claim need not be clearly sexual in nature. *Hicks v. Gates Rubber, supra.* Whether the sexual harassment complained of is sufficiently pervasive to create a hostile work environment is determined from the totality of the circumstances. *Hicks v. Gates Rubber, supra.*

> A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits.... [T]he totality of the circumstances necessarily includes the severity, as well as the number, of incidents of harassment.

*Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1511 (11th Cir.1989).

■ Hansel is a member of a protected group. The acts of sexual harassment were unwelcome. She was harassed because she is a woman.

The evidence is overwhelming that Hansel's harassment was so severe and pervasive that, under the totality of the circumstances, her conditions of employment were altered and there was a hostile work environment at Comanche from 1980 to 1988. Hansel's male co-workers intentionally and systematically set out from the beginning of her employment to drive her from her job because she is a woman. Although the nature of the harassment changed after 1983, the hostile environment persisted. Indeed, the level of intolerable hostility escalated as it became subtle and insidious. *See generally, Waltman v. International Paper Co.,* 875 F.2d 468 (5th Cir.1989).

PSC had actual and constructive knowledge of this hostile work environment yet it failed to take prompt, effective, and appropriate remedial measures. In *Hirschfeld v. New Mexico Corrections Department,* 916 F.2d 572, 577 (10th Cir.1990), the Tenth Circuit explained that, under "applicable agency principles", an employer is liable for its own negligence. "Employer negligence in this context is defined as failing to remedy or prevent a hostile or offensive work environment ..." *Id.*

However, employers are not strictly liable. An "employer must take prompt and appropriate remedial action *reasonably calculated* to end the harassment." *Waltman,* 875 F.2d at 479.

Thus, not every response by an employer will be sufficient to discharge its legal duty. The response must be reasonable under the totality of the circumstances. What is appropriate remedial action necessarily depends on the particular facts of each case with focus upon the severity and persistence of the harassment and the effectiveness of any initial remedial steps. *See, Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir.1991), (Title VII requires more than a mere request to refrain from discriminatory conduct and courts may take into account a remedy's ability to deter. "Employers send the wrong message to potential harassers when they do not discipline employees for sexual harassment"); *DeGrace v. Rumsfeld,* 614 F.2d 796, 805 n. 5 (1st Cir.1980), ("more than mere verbal chastisement of those employees who used racial epithets was needed in order for [the defendant] forcefully to convey the message that racism would not be tolerated").

Here, because the overt, physical harassment stopped, PSC argues it took appropriate remedial action in 1983 when it merely discussed Hansel's allegations with four of her co-workers. PSC misconstrues the nature of the remedial action required of it by Title VII under the circumstances of this case.

A hostile work environment is like a disease. It can have many symptoms, some of which change over time, but all of which stem from the same root. The etiology in this case is pure gender bias.

PSC may have attempted treatment of one symptom of the hostile environment, the physical abuse, but it failed completely to remedy the disease of hostile work environment. Moreover, the sexual harassment here was so egregious that merely "discussing" the matter with four of the perpetrators cannot reasonably be calculated to halt the harassment. Indeed, the hostile environment continued unabated after 1983.

PSC also seeks to escape liability by blaming the victim here for not coming forward with more detailed information. However, Title VII imposes on employers an affirmative duty to seek out and eradicate a hostile work environment. *Garziano v. E.I. DuPont de Nemours & Co.*, 818 F.2d 380, 388 (5th Cir.1987). Similarly, mere availability of a grievance procedure does not necessarily insulate that employer from liability. *Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408. An employer simply cannot sit back and wait for complaints. The very nature of sexual harassment inhibits its victims from coming forward because of fear of retaliation. As is patent here:

> A duty to conduct further investigations arises when a report or reports of sexual harassment to management suggests that the workplace may be charged in a sexually hostile manner.... [Defendant] instead ignored the warning signs of a hostile work environment. The evidence reveals a supervisory attitude that sexual harassment is an incident-by-incident matter; records were not maintained that would have permitted an analysis of sexual harassment complaints to determine the level of sexual hostility in the workplace. Under these circumstances, the Court concludes that [defendant] received adequate actual knowledge of the state of the work environment but, like an ostrich, the company elected to bury its head in the sand rather than to learn more about the conditions to which female employees, [plaintiff] in particular, were subjected.

*Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1530 (M.D.Fla.1991). In this case the writing was literally on the walls. It is understatement to say that plant management's reading of it necessarily establishes its knowledge of a sexually charged hostile environment at Comanche.

PSC's "blame the victim" attitude is also evidenced by its list of responsive actions following Hansel's May 10, 1983 complaints. Each require *Hansel* to do something—to carry a knife, to form a support group with the "other gals", or to develop a thicker skin. But PSC, not Hansel, tolerated the intolerable hostile environment. This employer cannot discharge its legal duty by requiring the victim of the sexual harassment to remedy the situation herself. Rather, it was PSC's duty to provide Hansel a workplace free from sexual harassment.

In November, 1987, PSC posted and reaffirmed its EEO policy and held pluralism classes at the plant. The company attempted to remove graffiti and obscene materials from the plant. While these belated efforts are laudable, they were of no benefit to Hansel. She had been subjected to extreme sexual harassment since 1980. She suffered severe physical and psychological abuse for years before PSC took remedial action. PSC never noticed, much less took proactive steps to investigate, the sexually charged hostile work environment at Comanche. Sexually explicit graffiti identifying Hansel by name and degrading cartoons were on the walls at Comanche, sometimes for months and even years at a time. None of Hansel's co-workers were effectively disciplined. *See, Bennett v. Corroon & Black Corp.*, 845 F.2d 104 (5th Cir.1988), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989), (employer failed to take prompt and adequate remedial action where he waited one day before removing sexually explicit cartoons depicting plaintiff from the men's bathroom). Indeed, the hostile environment even continued after Hansel filed her EEOC complaint, as shown by PSC's own June, 1988 memo on women in non-traditional jobs. There was no persuasive evidence that PSC now has an effective EEO mechanism in place to monitor the state of its work environment.

PSC's remedial actions were long on words and short on action. Despite the severe, egregious, and pervasive sexual bias and harassment, PSC merely held classes and posted memos.

Under the totality of the circumstances here, I conclude as a matter of law that PSC was at least negligent in its failure to take prompt and appropriate remedial action required by Title VII. Given the duration, frequency, and severity of the perva-

sive gender bias and sexual harassment, PSC's actions cannot be deemed reasonably calculated to remedy the hostile environment within which Hansel worked. Even as late as 1988, after this suit was filed, PSC failed to take *effective* remedial measures to eradicate this hostile work environment.

Finally, I reject out of hand PSC's argument that evolving sensibilities absolve it of liability. I have no doubt that the facts of this case would rattle the sensibilities of the ancestors in Darwin's family tree.

## B. STATUTE OF LIMITATIONS

■ Plaintiff filed her EEOC complaint on December 29, 1987. Title VII provides for a limitations period of no more than 300 days, which begins to run on the day plaintiff files her EEOC complaint. 42 U.S.C. § 2000(e)–5(e); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Therefore, defendant cannot be liable for any violation that occurred before March 4, 1987.

■ An exception to this rule allows evidence of violations occurring before the 300 day limit if the offense is a continuing violation of Title VII. *Bruno v. Western Electric Co.*, 829 F.2d 957 (10th Cir.1987). Under this exception, a plaintiff must show "a series of related acts, one or more of which falls in the limitations period." *Id.* at 961. "The relevant distinction is between isolated and sporadic outbreaks of discrimination and a dogged pattern." *Id.*

The sexual harassment suffered by Hansel from 1980 to 1988 was a dogged pattern. She was marked from the first day after her probation and the abusive work environment continued beyond the time she filed this lawsuit eight years later. It does not matter that the form of harassment changed over time, nor does it matter that the identity of those responsible changed over time. The continuing violation of Title VII is the hostile environment itself.

[A] hostile environment claim usually involves a continuing violation. In a hostile environment, an individual feels constantly threatened even in the absence of constant harassment. Thus, in looking at the frequency of the harassment, the focus should not be a mechanical calculation. Rather, in light of *Meritor Savings Bank*, the court should review the pattern and frequency of the harassment and determine whether a reasonable person would feel that the environment was hostile throughout the period that formed the basis of plaintiff's claim.

*Waltman*, 875 F.2d at 476. I conclude that any reasonable person would feel that the environment at Comanche was hostile throughout the period from 1980 to 1988.

Likewise, the series of related acts that formed the hostile environment continued into the limitations period. Hansel found a sign in the summer of 1987 which said "Sexual harassment in this area will not be reported however, it will be graded." After it was posted on an employee bulletin board, a PSC EEO policy statement dated October 2, 1987 was altered to read that sexual advances were "welcome." There was sexually explicit graffiti at the plant into 1990. Furthermore, PSC did not begin to take effective remedial action until after Hansel filed this action. Therefore, Hansel has satisfied the filing requirements of Title VII.

## C. DISPARATE TREATMENT

■ Hansel bears the burden of establishing her prima facie case of disparate treatment. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). If she cannot prove the prima facie elements, then the burden of proof does not shift to PSC to show legitimate, nondiscriminatory reasons for the allegedly differential treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Under Title VII, a disparate treatment claim requires the plaintiff to show, as part of her prima facie case, that her *employer* treats one or more employees less favorably because of their race, color, religion, national origin, or sex. *Teamsters*, 431 U.S. at 335, n. 15, 97 S.Ct. at 1854 n. 15; *Cominiello v. John Deere Co.*, 685 F.Supp. 759, 763 (D.Colo.1988).

Here, Hansel has not shown that PSC management treated her or any other woman differently because of gender. Hansel received the same training as all other auxiliary tenders at Comanche. She was offered the training for the equipment operator position as soon as she achieved the seniority required under the union contract. She was never denied any promotion. Therefore, Hansel has not established her prima facie case and I conclude as a matter of law that PSC is not liable to Hansel for the alleged disparate treatment.

## D. DAMAGES

Under Title VII, I may award back pay, reinstatement, or "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000(e)–5(g). In determining what relief is appropriate, I look to the purposes of Title VII. "It is ... the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

> [W]here a legal injury is of an economic character "the general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed."

*Id.*, quoting, *Wicker v. Hoppock*, 6 Wall 94, 99 (1867). *See also, Franks v. Bowman Transportation Co.*, 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976), (goal is to make the employee whole and restore the economic status quo that would have obtained but for the company's wrongful act).

I cannot award back pay here because Hansel's counsel introduced no evidence as to when she stopped receiving her salary. However, based upon the testimony of Drs. Ricci and Aldrich, I conclude that reinstatement is an impossible option for Hansel. Not only would returning to Comanche jeopardize her mental health, but many of the men who were her worst harassers are now in supervisory positions. The usual remedy in Title VII cases where reinstatement is not possible is "front pay." *See e.g., EEOC v. Safeway Stores, Inc.*, 634 F.2d 1273, 1281–82 (10th Cir.1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981).

Here, I am faced with a unique situation because Hansel is still technically an employee of PSC. She does not receive a salary, but she does receive benefits and she is carried on the personnel roster. Therefore, this case is not one of typical constructive discharge. *See generally, Derr v. Gulf Oil Corp.*, 796 F.2d 340 (10th Cir.1986).

However, merely because this action does not fit the usual constructive discharge mold does not mean that an award of front pay is inappropriate under my charge, in equity, to make Title VII claimants "whole." *Cf., Pitre v. Western Electric Co.*, 843 F.2d 1262, 1279, n. 10 (10th Cir.1988). Under Title VII, I have broad discretion to fashion appropriate equitable relief. 42 U.S.C. § 2000(e)–5(g); *Franks*, 424 U.S. at 770, 96 S.Ct. at 1266. This discretionary power should be exercised to allow the most complete achievement of the objectives of Title VII attainable under the facts and circumstances of the specific case. *Albemarle Paper*, 422 U.S. at 421, 95 S.Ct. at 2373; *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir.1980). *See also, Carter v. Sedgwick County*, 929 F.2d 1501, 1505 (10th Cir.1991), ("Decisions concerning front pay under Title VII fall within the trial court's discretion").

I conclude that Hansel is entitled to an award of front pay to compensate her for the continuing future effects of defendant's hostile work environment. Plaintiff is not receiving a salary now and she cannot return to her employment with PSC at Comanche. Therefore, front pay will make her whole.

However, quantification of front pay cannot be speculative. *Carter*, 929 F.2d at 1505. There must be some basis in the record upon which to base an award of

future earnings. *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir.1985). An award of front pay must specify an ending date and must take into account any amount that the plaintiff could earn using reasonable efforts. *Carter*, 929 F.2d at 1505. Here, to alleviate the speculative nature of a future damage award, I must take evidence concerning Hansel's salary and benefits at the time she stopped receiving them, any potential increase in her salary through regular promotions and cost of living adjustments, her work and life expectancy, the reasonable availability of other work opportunities for her, the period within which she may become re-employed with reasonable efforts, and methods to discount any award to net present value. *See, Shore,* 777 F.2d at 1160.

■ Because evidence was not proffered on these factors, I must set the question of the amount of front pay for a full hearing. Hansel bears the initial burden of proof concerning the amount of front pay and PSC bears the burden of proof on any issue in the nature of mitigation. *See, Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir.1990).

### E. RETROACTIVITY OF THE CIVIL RIGHTS ACT OF 1991

■ On November 21, 1991, the last day of trial in this case, President Bush signed into law the Civil Rights Act of 1991 (the Act). The Act, *inter alia,* makes compensatory and punitive damages available for the first time to a Title VII claimant such as Hansel. Section 102.

To determine whether the Act applies retroactively, I look to congressional intent. *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), ("where congressional intent is clear, it governs"); *DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 911 F.2d 1377 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). In *DeVargas,* the Tenth Circuit held that a statute would apply retroactively to pending cases only if there is clear congressional intent to that effect. *DeVargas,* 911 F.2d at 1390,

(adopting *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) as the law for the Tenth Circuit).

To determine whether there is congressional intent to apply this Act retroactively to this pending case, I start with the language of the Act. *DeVargas,* 911 F.2d at 1384. Section 402(a) of the Act provides "Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." In section 402(b), the Act states that "Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983." This is not a disparate impact case and no other language in the Act bears on the question of its retroactive application to pending Title VII actions.

Section 402 does not facially express *clear* congressional intent to apply the Act retroactively to cases such as this one. I recognize that under one settled rule of construction the exception in § 402(b) would be meaningless if § 402(a) is not also construed as a general rule of retroactivity. However, I read *DeVargas* to direct that I also consider the language of the Act in light of its legislative history. *DeVargas,* 911 F.2d at 1384–90.

A review of the legislative history confirms that Congress was anything but clear on whether the Act would apply to pending cases. The main Senate sponsors of the Act, Senators Danforth and Kennedy, issued a joint "interpretive memorandum" in which they agreed on every issue except retroactivity. 137 Cong.Rec. S15483 (Oct. 30, 1991). The republican senators lined up behind Senator Danforth, asserting that the Act was not intended to be retroactive. The democratic senators lined up behind Senator Kennedy, asserting that the Act was intended to be retroactive. 137 Cong. Rec. S15485 (Oct. 30, 1991). The legislative history from the House is similar with the republicans saying the Act is not retroactive and the democrats asserting the oppo-

site. *See e.g.,* 137 Cong.Rec. H9530–31, H9548, and H9549 (Nov. 7, 1991).

Therefore, congressional intent on this question is not clear. Accordingly, I hold that I cannot apply the Act retroactively in this case.

Accordingly, IT IS ORDERED THAT:

(1) Partial judgment shall enter in favor of plaintiff on her sexual harassment claim and against defendant determining that defendant has violated Title VII;

(2) A hearing on the amount of front pay to be awarded plaintiff shall be set;

(3) Partial judgment shall enter in favor of defendant and against plaintiff on her disparate treatment claim determining that defendant has not violated Title VII; and,

(4) Costs are awarded to plaintiff.