**Charles H. BERRY, Jerald S. Reynolds, and Jesse L. Carter, Jr., Plaintiffs,**

v.

**STEVINSON CHEVROLET, a Colorado corporation, Stevinson Toyota, a Colorado corporation, Stevinson Toyota East, Inc. d/b/a Mark Toyota, a Colorado corporation, and Charles Stevinson, individually, Defendants.**

**Civ. A. No. 90–B–916.**

United States District Court, D. Colorado.

Sept. 24, 1992.

124

Darold W. Killmer and Gilbert M. Roman, Feiger, Collison & Killmer, Denver, Colo., for plaintiffs.

John M. Husband, Gregory A. Eurich, Brian M. Mumaugh, Holland & Hart, Denver, Colo., and Martin P. Miller, Miller & Leher, Littleton, Colo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

### I. Background

This case was tried to the Court for ten days beginning August 24, 1992. I have jurisdiction over plaintiffs' claims under 28 U.S.C. §§ 1331 (1980) and 1343(a)(4) (1979) and 42 U.S.C. § 1988 (1980). Venue is proper under 28 U.S.C. § 1391(b) (1988) and 42 U.S.C. § 2000e–5(f)(3) (1972). Each plaintiff asserts Title VII claims against the defendants for discriminatory discharge. In addition, plaintiff Charles H. Berry (Berry) asserts a failure to promote claim under 42 U.S.C. § 1981 (1976) against defendants Stevinson Chevrolet (Chevrolet West) and Charles Stevinson (Stevinson). Jerald S. Reynolds (Reynolds) also asserts a Title VII retaliation claim against Stevinson Toyota West (Toyota West) and Stevinson. I now enter my findings of fact, conclusions of law, and order for judgment.

### II. Findings of Fact

#### A. *General Findings*

Chevrolet West, Toyota West, and Stevinson Toyota East, Inc. d/b/a Mark Toyota (Mark Toyota) are automobile dealerships in the Denver metropolitan area owned and managed principally by Stevinson. Chevrolet West, Toyota West, and Mark Toyota are employers under 42 U.S.C. §§ 2000e through 2000e–17.

All plaintiffs are black. Berry was employed at Chevrolet West as a salesperson from October 1978 to September 1989. Reynolds was employed at Toyota West as a general sales manager from January 1, 1989 to August 4, 1989 when he was discharged. Jesse L. Carter, Jr. (Carter) was employed at Chevrolet West in January 1984. He was transferred to Mark Toyota in November 1985 and discharged from his position as a new car sales manager on July 1, 1987.

All plaintiffs have exhausted their administrative remedies. Berry received his EEOC right to sue letter on June 8, 1990. Reynolds received his right to sue letter on June 4, 1990 on his discrimination charge and on September 8, 1990 concerning his retaliation charge. This action was filed on May 24, 1990, within ninety days of Berry's and Reynolds' receipt of their notice of right to sue letters.

### B. *Carter*

Carter filed his charge of discrimination with the EEOC on July 6, 1987. On June 6, 1988, the EEOC issued its determination that there had been no violation of Title VII and that day mailed Carter's right to sue notice by certified mail return receipt requested to Carter's address of record, 6165 E. Iliff Avenue, # 419E, Denver, CO 80222. The notice was returned unclaimed after the post office made three attempts at delivery on June 7, 1988, June 11, 1988, and June 22, 1988.

Carter testified that the above address was his home address and he was there during June 1988. However, he testified that he never received the notice of right to sue or the notices of attempt to deliver it. The "window style" envelope, (Exhibit D-19), contains Carter's correct address, including zip code. Exhibit D-20 shows the same envelope without the addressed enclosure and a receipt for certified mail designating a street address of 6165 E. Iliff, # 419E. The receipt omits the word "avenue" and the zip code. However, the envelope has a bar code that is read by the postal department's scanning equipment. Donald Finney of the postal department testified that this nine digit bar code reads "80222-5810" designating the zip code and the 6100 block of E. Iliff Avenue, Denver, Colorado. Mr. Finney testified credibly that the chances of misdelivery are three percent and, in this instance, it was virtually impossible for the notice not to have been delivered three times.

I find that the notice of right to sue letter was mailed by certified mail to Carter's correct address and he failed to receive it as a result of his own neglect and inattention. These findings rest upon evidence independent of the record of the EEOC's April 4, 1988 predetermination telephone interview with Carter. (Exhibit D-15.) At that time the EEOC advised him of its anticipated determination adverse to his charge. Carter made no effort to contact the EEOC after that date. This further evidences Carter's inattention and neglect.

No evidence was presented that anyone deceived Carter regarding the procedural requisites for filing timely his lawsuit. Almost two years after the issuance of the right to sue letter Carter joined with Berry and Reynolds in filing this action on May 24, 1990.

### C. *Berry*

Berry quit Chevrolet West after almost eleven years as a used car salesperson at that dealership. The evidence concerning his claims of constructive discharge and failure to promote is in stark conflict. However, from Berry's credible testimony, corroborated by the credible disinterested testimony of other former employees at Chevrolet West, I find that management at Chevrolet West engaged in discriminatory conduct which produced working conditions that a reasonable person would consider intolerable. I further find that, although Berry made known his desire for promotion and was qualified for promotion to new or used car sales manager, he was denied promotion because of his race in favor of less qualified white individuals. The evidence as to these two claims is interrelated.

There is little evidence of racial hostility before Carter started to work at Chevrolet West in 1984. Carter testified credibly that while employed there he heard general manager, Reggie Bonino, and general sales manager, James Malafronte, refer to black customers as "spicoons" and often as "credit bandits" or "credit criminals". Dennis Guse testified by deposition that he was employed at Chevrolet West between March 1984 and October 1987. He testified that Bonino was "a constant user of the word 'nigger' and 'darkie' when referring to Mr. Berry". Bonino and Malafronte told him that "tusconne" is an Italian word for "nigger". Bonino would ask such questions as "where is the darkie today", "what is the tusconne doing", "is the tusconne selling any cars". On one occasion Malafronte told Guse not to eat lunch with Berry in the lunch room because Bonino would not like him associating with a nigger. During the spring of 1987 at a manager's meeting, Guse told Bonino that Berry was interested in a management posi-

tion. Bonino replied "I don't trust niggers and I don't want niggers in management".

Although Berry and Bonino would at times banter with each other in terms such as "spicoon" and "dago", when Jim Crisafi was hired as the new car manager at Chevrolet West in March 1989, Crisafi encouraged, promoted, and infused racial hostility to an intolerable level. Crisafi became antagonistic to Berry from the outset. As the hostility increased, Crisafi told Berry that "I got permission to gas you nigger" and "I got permission to blow your ass out nigger". Crisafi told David Musgrave, then employed at Chevrolet West, that they should "gas the nigger" and that they "need to get the nigger out—he's a trouble maker".

Stevinson's stated policy is to promote employees from within the organization to management positions. However, Paul Birge is an example of one who was hired from outside the organization into management despite limited automotive sales or management experience. Birge, no longer employed at Chevrolet West, testified that Crisafi told him that he would "get Berry's black rear end [ass] fired if I could". He also testified that he heard Crisafi say to Bonino "well we just have to get rid of his black ass".

Crisafi testified that he tried to get along with everybody. He denied making any racially derogatory comments and denied ever using the word "nigger". Crisafi's credibility was impeached by deposition. His claim that he never used racist language rings hollow.

Crisafi testified that he was aware of Stevinson's written policy prohibiting both racially and sexually derogatory language in the work place and that such language and attitude had no place in his life. Yet, the following colloquy occurred on cross examination by plaintiff's attorney, Ms. Lynn D. Feiger:

Question: Mr. Musgrave—you considered Mr. Musgrave an honest person?

Answer: I can't say that.

Question: Could you turn to page 47 of your deposition, line 3, was this question asked and the answer given:

Question: Did you get along with David Musgrave?

Answer: Yes.

Question: Did he seem like basically an honest person?

Answer: Yes.

Question: And there's no bad blood between you and Mr. Musgrave or anything like that was there?

Answer: No, *babe,* but what—I'm sorry, what's your name again?

Question: My name is Ms. Feiger." (emphasis added)

Crisafi's testimony is wholly incredible.

The Stevinson dealerships' written policy signed by the employees prohibiting racial and sexual harassment urges all employees who feel they are being subjected to harassment to report the matter to any member of management. (*See* Exhibit A-1.) All Stevinson dealership managers attended seminars where they were told that such harassment would not be tolerated. Bonino attended these seminars. Yet, he testified that "affirmation action" means to discipline an employee. For example, he claims that he would take "affirmative action" against an employee who steals gasoline. Nor could he define "racial harassment". He, like other white managers, testified that they simply never saw racial harassment. These managers also testified that they were instructed to document employee misconduct to later objectively justify discipline. Nevertheless, despite the plethora of reasons now given for Reynolds' termination, *see infra,* none of those events was documented.

Stevinson's policy encourages employees to complain to management about racial or sexual harassment. Berry complained to Bonino about Crisafi but Bonino told him that he was "high on this dago—If him or you its you". He complained to Malafronte about Crisafi but was told to talk to Bonino. Berry's efforts to complain to Bonino and Malafronte concerning Crisafi were fruitless. In any event, complaints to managers engaged in racial harassment themselves would be pointless.

Stevinson touts an open door policy that any employee may contact him directly to complain of unjust treatment. After Carter filed his discrimination charge with the EEOC in 1987, Berry advised Stevinson of his interest in management to build a resume for eligibility to become a minority dealer owner. Stevinson retorted that blacks don't have the experience to be successful dealers. In response to Stevinson's expression of concern about Carter's EEOC complaint, Berry told him he thought the dealership had a racist attitude. Stevinson then related to Berry, as he had in the past to Carter, the story about a little black boy who felt sorry for himself until confronted with a blind white child. Although Stevinson meant well in his efforts to show that there are others less fortunate, this demonstrates insensitive racial paternalism. This meeting further evidences the futility of complaint of racial harassment to management at Chevrolet West. I find defendants' policy was devoid of meaningful effect.

Berry testified credibly that there were no sincere or genuine offers of promotion. Indeed, such "offers", if any, were made in passing without specific reference to terms. When Joe McNulty was promoted in short order from sales, to lease manager, to used car manager, Bonino told Berry that "I know you could call me on this one—There's just something that won't let me make you a manager". Bonino once told Musgrave that he had one "jig" in management and he would not have another. Yet another credible former employee testified that Bonino told him that "blacks in management don't mix".

The usual progression to new or used car manager is through the position of assistant new or used car manager. Indeed, despite the lack of pecuniary compensation as an assistant new or used car manager, that position can afford valuable training to be a successful new or used car manager. However, management played fast and loose with the normal chain of promotion and other white employees such as McNulty, Birge, and Wilson were not necessarily trained or experienced in this ideal fashion.

There is no dispute that Berry was an extremely effective and qualified salesperson. Anthony Rosales, a long time former Stevinson manager at Toyota West, testified that Berry was qualified to be a used car manager. Stevinson testified that he knew Berry wanted the position but that he was not qualified. However, Stevinson was effectively impeached through his deposition where he testified that Berry was qualified to be a used car manager. I discredit Stevinson's trial testimony on this issue and am convinced by the evidence presented that Berry was qualified for promotion to new or used car manager.

According to Linda McCall, Stevinson's assistant, between 1984 and 1990 there had been only five blacks hired at Chevrolet West when Berry quit and out of approximately 110 employees, he was the only black employee other than one black person in the parts department. Between 1984 and the filing of this action in May 1990 only six blacks had been employed in management. Defendants assert that Berry did not want to be promoted, was not qualified for promotion to new or used car manager, and left Chevrolet West for greener pastures. I am not persuaded and I find these assertions to be mere pretexts.

Defense witnesses testified it was a mere coincidence that after Carter filed his EEOC complaint in 1987, Marcus Henderson and Reynolds, both black, were hired into management positions. However, soon thereafter, Henderson was demoted and then quit. Reynolds, of course, was fired after seven months as general sales manager at Toyota West.

### D. *Reynolds*

██ Reynolds makes no claim that a hostile work environment existed at Toyota West. Nor is there evidence of such an environment. As in Berry's case, much of the evidence concerning Reynolds' discharge and retaliation claims is in stark conflict.

Reynolds was interviewed by Stevinson, his son Kent Stevinson, and Doug Smock, Toyota West's general manager. He was made aware of management's concern that

Reynolds' predecessor, Rosales, had not performed satisfactorily as new car sales manager. Performance in this position is measured by the gross profit per car unit sold. Reynolds represented that at his previous position he had produced a gross profit per unit of $1,000.00 on a high volume of sales.

While at Toyota West, management regularly discussed with Reynolds and counseled him about continued decreases in his gross profit per unit. During Reynolds' eight month tenur at Toyota West, his average gross profit per unit was substantially below that of his predecessor, Rosales. His gross average profit per unit was also below the Toyota regional average. Toyota West's adjusted profit/loss statements further reflect that Reynolds' department was losing over $74,000.00 per month as compared with Rosales' loss of approximately $23,000.00 per month during 1988.

Reynolds was terminated on August 4, 1989. He filed his EEOC complaint on March 1, 1990. After receiving notice of the filing of Reynolds' EEOC complaint, Stevinson immediately conducted extensive interviews with other employees concerning the circumstances raised in the EEOC complaint. At trial, defendants produced evidence to support a plethora of Reynolds' allegedly unacceptable business practices. I find that these allegations and the evidence presented in support thereof constitute undocumented, after-the-fact pretexts for Reynolds' termination. Nevertheless, I find it to be more probable than not that the sole reason for his termination was his unsatisfactory performance measured by gross profit per unit. I am neither satisfied nor persuaded that his management performance was a result of his inheritance of old inventory or the tension that naturally exists between a new and used car sales manager in the latter's valuation of used cars.

While Reynolds was employed at Toyota West that dealership earned a bonus through a Toyota Motor Sales, U.S.A., Inc. sales promotion. This bonus was to be distributed among the sales managers at that dealership. $1,000.00 was allocated to Steve Szekula (Szekula) and $500.00 to Dennis Swan (Swan). It was determined that individual checks would be issued by the distributor in the name of each recipient. In April, before the checks were received, Szekula and Swan quit Toyota West without notice. Stevinson flagged each of their personnel files with a notation "not for rehire per C.E.S.".

Szekula pestered Reynolds about the bonus. As a result, on May 3, 1989, Reynolds had his wife withdraw $1,600.00 in cash from their account at Denver West Bank and Trust (owned principally by Stevinson). That day Reynolds paid Szekula $1,000.00 in cash and gave Szekula $500.00 in cash to deliver to Swan. Reynolds kept $100.00 for his own use. Reynolds admits that he neglected to obtain a receipt from Szekula or specific oral or written authorization to negotiate the Szekula and Swan bonus checks when received. Reynolds apparently trusted Szekula to deliver the $500.00 to Swan and to later acknowledge Szekula's receipt of the $1,000.00 in cash. Szekula denied receipt of the cash. I am persuaded that Szekula received the cash. Reynolds had received and deposited his bonus check on May 1, 1989.

On May 4, 1989 the Swan and Szekula bonus checks were delivered to Toyota West. May 4, 1989 was Reynolds' birthday. Kent Stevinson gave him the day off and a new Jaguar to drive that day. He called the dealership, and was told that the Szekula and Swan checks had arrived. He and his young son went to the dealership to pick up the checks. Reynolds believed, and I find, that he had implied authority to negotiate the checks for Szekula and Swan. Hence, he instructed the dealership's secretary, Patty Wilson, to type endorsements on the back of each check "Pay to the order of Steve Reynolds". He then signed Szekula's name to Szekula's check and directed Patty Wilson to sign Dennis Swan's name to Swan's check. He, his son, and Patty Wilson then went to Denver West Bank and Trust where the checks were deposited. Reynolds then gave Patty Wilson $100.00 in cash and the rest of the day off. Patty Wilson, a single parent, testi-

fied that she has a good job at Toyota West and will do what her boss tells her to do.

In February 1990, while employed at Douglas Toyota, Reynolds was contemplating filing an EEOC complaint concerning his termination at Toyota West. Szekula was employed at yet another dealership, Metro Toyota. On February 25, 1990, the two met for lunch and Reynolds agreed to set up an interview for Szekula at Douglas Toyota. During lunch Reynolds informed Szekula of his intent to file an EEOC complaint against Toyota West. On February 27, 1990, during the interview at Douglas Toyota, while still employed at Metro, Szekula accepted an offer to work at Douglas Toyota.

Although he had just landed a new job with Douglas Toyota, Szekula telephoned general sales manager Chuck Fellmer at Toyota West on February 28, 1990 to ask whether there was a job opening available for him there. Fellmer informed him that there was none. Fellmer and Szekula denied discussing Reynolds' EEOC complaint. However, I infer that at that time Szekula told Fellmer of Reynolds' contemplated EEOC complaint. Then, on March 1, 1990, Fellmer telephoned Szekula and told him that if he wanted a job at Toyota West to call Stevinson at his home. Szekula had only spoken to Stevinson in passing in the past. Fellmer testified that on March 1, 1990, he was in desperate need of a good producer and there was no one else available but Szekula.

Szekula telephoned Stevinson at his home on the evening of March 1, 1990, and on March 2, 1990, had breakfast with Stevinson. Despite having flagged Szekula's personnel record with "not for rehire per C.E.S.", Stevinson offered Szekula a management position at Toyota West. Contrary to usual hiring practice, no terms of employment were discussed, including compensation. Stevinson denied discussing Reynolds' EEOC complaint during his breakfast meeting with Szekula. However, I infer that subject was discussed.

Szekula began his reemployment at Toyota West on March 3, 1990. Reynolds filed his EEOC complaint on March 1, 1990. On March 7, 1990, defendants received notice of Reynolds' EEOC filing.

During his investigation of Reynolds' EEOC complaint, Stevinson informed Fellmer that Szekula had received an IRS form 1099 concerning Szekula's May, 1989 $1,000.00 bonus, but Szekula had not received the money. Szekula testified that after receiving the form 1099 he ordered a copy of his bonus check from Toyota's national distributor.

Reynolds testified that between February 25, 1990 and March 30, 1990, Tom Medina, a sales person employed at Toyota West for five years, telephoned him to warn about a "set up". At trial, Medina denied making such a call. However, he has since been promoted to management.

On March 30, 1990, Szekula met with investigator Richard Millsaps (Millsaps) of the Jefferson County Sheriff's Office to complain of forgery. During Millsaps' investigation of the complaint, he contacted Patty Wilson. Later, on April 12, 1990, Wilson informed Millsaps that she had signed Swan's name to his check. This was the first notice Millsaps had regarding Swan. As a result of Szekula's complaint, the district attorney filed criminal charges of theft and forgery against Reynolds in the Jefferson County District Court.

This action was filed on May 24, 1990. The answer was filed July 3, 1990. On July 6, 1990, Swan was rehired as a used car manager at Toyota West with a three month $5,000.00 per month salary guarantee, despite his personnel file having been flagged "not for rehire per C.E.S." and his having a known drinking problem. Swan was later terminated and moved from Colorado. He did not appear at the trial of the criminal charges and did not appear at the trial of this action.

Szekula is now the general sales manager at Toyota West. This is the position previously held by Reynolds.

Both Szekula and Swan also had filed affidavits of forgery with Denver West Bank and Trust and, as a result, received $1,000.00 and $500.00 respectively from that bank. On July 17, 1990 the bank filed

a civil action against Reynolds. Defense witnesses, however, testified that it was the bank's regular practice to file such actions, if necessary. Reynolds' attorneys then filed substantial counterclaims against the bank and that action remains pending. I find that Denver West Bank and Trust filed civil claims against Reynolds in accordance with its standard policies, and not in retaliation for Reynolds filing an EEOC complaint. Furthermore, I am not persuaded that any of the defendants directed or encouraged Denver West Bank and Trust to file civil claims against Reynolds.

Trial of the criminal charges was held beginning February 21, 1991. On February 23, 1991, Reynolds was acquitted of the charges. Stevinson telephoned the Jefferson County District Attorney about that case the next day. Stevinson is a campaign contributor to that district attorney and the district attorney rents office space from Stevinson.

Defense witnesses uniformly denied that the criminal charges were in any way related to Reynolds' EEOC filing. However, I find it to be more probable than not that Stevinson and others in management at Toyota West caused Szekula to initiate the criminal complaint with the sheriff's office for the purpose of retaliating against Reynolds for his having filed a discrimination charge with the EEOC. The sequence and timing of these events, including Szekula's delay in going to the authorities, is sufficient probative circumstantial evidence that Toyota West and Stevinson used and encouraged Szekula to initiate this investigation and prosecution.

My finding on this issue also rests on my judgment of witness credibility. I closely observed Reynolds when he testified. My judgment of his demeanor and testimony, in light of all the evidence in this case, drives my determination that he was credible in all respects. To the contrary, defense witnesses lacked persuasive credibility in material aspects of their testimony. Stevinson may be devoid of racial bias. However, he presents himself to be such a person to the point of hubris. I find that Reynolds' allegations to the contrary drove Stevinson to retaliate against Reynolds by causing Szekula to report the alleged forgery.

### E. Damages

I find Berry's damage analysis presented by defendants' economist, Janet L. Johnson to be persuasive. Her conclusions concerning Berry's damages are founded upon sound assumptions supported by the evidence and common sense. Likewise, I find persuasive her critique of Berry's loss analysis. (*See* Exhibit B–21.) Accordingly, I find that Berry incurred no notable economic losses related to his constructive discharge, but his losses incurred as a result of Chevrolet West's failure to promote him to a sales manager position amount to $72,822.00.

Toyota West's and Stevinson's retaliation against Reynolds for filing his EEOC complaint has caused him extreme emotional distress, suffering, embarrassment, humiliation, loss of reputation, standing in the community, and other hardship. I find that he has suffered compensatory damages in the amount of $250,000.00. In addition he expended $15,000.00 in defending against the theft and forgery charges. I find that these charges never would have been prosecuted but for Reynolds' EEOC complaint.

### III. Conclusions of Law

#### A. Carter

A plaintiff must bring his Title VII claim within ninety days after receiving his notice of right to sue from the EEOC. 42 U.S.C. § 2000e–5(f)(1). Carter asserted his Title VII claim more than ninety days after the EEOC delivered him his notice of right to sue. Carter claims the ninety day filing period is tolled by the equitable tolling doctrine.

■■■ A Title VII time limit will be tolled *only* if there has been active deception of the claimant regarding procedural prerequisites. *Scheerer v. Rose State College,* 950 F.2d 661, 665 (10th Cir.1991) (emphasis in original), *cert. denied,* —— U.S. ——, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992); *Johnson v. United States Postal*

*Service,* 861 F.2d 1475, 1481 (10th Cir. 1988), *cert. denied,* 493 U.S. 811, 110 S.Ct. 54, 107 L.Ed.2d 23 (1989). Also, the principles of equitable tolling do not extend to a garden variety claim of excusable neglect. *Irwin v. Veterans Administration,* 498 U.S. 89, ——, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435, 444 (1990); *Polsby v. Chase,* 970 F.2d 1360, 1366 (4th Cir. August 12, 1992).

■ Carter should have received his right to sue letter by at least June 22, 1988 when the post office attempted to deliver it for the third time to his correct address. His failure to file his Title VII claim within ninety days of this date was not the result of agency default or deception. Rather, he did not receive the EEOC right to sue letter because of his own neglect and inattention. Equitable tolling, therefore, does not suspend the ninety day filing period for Carter's Title VII claim. Because Carter did not file his Title VII claim timely it will be dismissed.

B. *Berry*

1. *Title VII Claim*

a. *Liability*

■ The test for a constructive discharge is whether a reasonable person would view the working conditions as intolerable. *Hirschfeld v. New Mexico Corrections Department,* 916 F.2d 572, 580 (10th Cir.1990). Chevrolet West's upper management directed racial slurs at Berry. He was passed over for positions which were given to less qualified white individuals. Bonino even told Berry that "there's just something that won't let me make you a manager". Bonino admitted that Berry "could call me on this one". Berry has. A reasonable person could not have tolerated these working conditions. In accordance with my findings of fact I conclude that Berry was constructively discharged from his position at Chevrolet West.

■ Under Title VII it is unlawful to discharge or discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of his race or color. 42 U.S.C. § 2000e–2(a)(1). To prove his Title VII claim Berry must establish a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). A plaintiff establishes a *prima facie* case of discrimination by demonstrating by a preponderance of the evidence that: (1) plaintiff belongs to a racial minority; (2) he was discharged from or denied a job for which he was qualified; and (3) after his termination or rejection the position was given to a member of another race. *See Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6. If Berry proves a *prima facie* case of discrimination, the burden shifts to defendants to prove that there was a legitimate, non-discriminatory reason for his discharge or failure to promote. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. If defendants sustain this burden, Berry must prove by a preponderance of the evidence that the legitimate reasons offered by the defendants were not true, but a pretext for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ Berry is a member of a racial minority. He was a productive salesperson and qualified to be a new or used car sales manager. Bonino flatly stated that blacks in management do not mix, and that after having one "jig" in management he would not have another. Combining these remarks with the abundance of upper management's other racists comments directed at Berry, I conclude that Berry has established a *prima facie* case that he was constructively discharged from his sales position, *see Hirschfeld,* 916 F.2d at 580; *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412 (10th Cir.1987); *Hansel v. Public Service of Colorado,* 778 F.Supp. 1126, 1131 (D.Colo.1991), and denied a management position because of his race. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094.

I further conclude that Chevrolet West's stated reasons for discharging and not promoting Berry are pretextual. He was an effective salesperson and qualified to be a new or used car sales manager. Even so, less qualified white individuals were pro-

moted to management positions. Meanwhile upper management subjected Berry to racial slurs and did not act on his complaints about these derogatory statements. I conclude that Chevrolet West constructively discharged and failed to promote Berry because he is black. Berry has proven his Title VII claim and is entitled to relief under this statute.

### b. *Remedies*

■ The remedies available for a violation of Title VII are back pay, reinstatement, or any other equitable relief as the court deems appropriate. 42 U.S.C. 2000e–5(g). Back pay includes the benefits and other forms of compensation a discrimination victim would have earned in a position he would have obtained had the employer not discriminated against him. *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1119 (3d Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). Had Chevrolet West not discriminated against Berry he would have become a sales manager. As a result of not being promoted to this position Berry lost $72,-822.00. This amount is awardable to him under Title VII as back pay. Berry, however, incurred no notable losses as a result of his constructive discharge. Accordingly, he shall not recover any damages for his constructive discharge. Berry does not seek reinstatement and this relief would be clearly inappropriate under the circumstances.

### 2. *Section 1981 Claim*

### a. *Liability*

■ Section 1981 ensures that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens ...". 42 U.S.C. § 1981. Whether a denial of promotion is actionable under section 1981 depends on whether the nature of the change in position was such that it involved the opportunity to enter into a new contract. *Patterson v. McLean Credit Union*, 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989). I use the *Burdine* shifting burdens

analysis to determine whether racial animus prompted a refusal to promote in violation of section 1981. *Patterson*, 491 U.S. at 186, 109 S.Ct. at 2378; *Sabol v. Snyder*, 524 F.2d 1009, 1012 (10th Cir.1975).

■ Berry held a sales position at Chevrolet West for approximately eleven years before he quit. As a sales manager he would have had new responsibilities, a different relationship with Chevrolet West, and an increased income. I conclude that promotion to a sales manager position would have created a new contract between Berry and Chevrolet West. In accordance with my previous findings of fact and conclusions of law I conclude that Chevrolet West's refusal to promote Berry to a sales management position was racially motivated. Therefore, Chevrolet West's refusal to promote Berry to a management position violates section 1981.

### b. *Remedies*

■ The only loss Berry has proven as a result of Chevrolet West's refusal to promote him is the difference between his sales position salary and the salary he would have earned had he been promoted to new or used car sales manager. This difference is $72,822.00. Berry shall recover this amount on his section 1981 claim. He, however, is not entitled to recover this amount twice for his Title VII claim and section 1981 claim.

■ Punitive damages may assessed under section 1981 if the discrimination is malicious, willful, and in gross disregard of the plaintiff's rights. *Jackson v. Pool Mortgage Co.*, 868 F.2d 1178, 1181 (10th Cir.1989). Although Chevrolet West intentionally discriminated against Berry, I am not persuaded that it did so maliciously, willfully, and in gross disregard of his rights. Accordingly, I decline to awarded punitive damages to Berry on his section 1981 claim.

### 3. *Stevinson individually*

■ I conclude that Stevinson is not personally liable on Berry's Title VII and section 1981 claims. Stevinson personally

did not discriminated against Berry. Furthermore, he is not liable individually based on agency principles because the employees and managers who discriminated against Berry were employees of Chevrolet West, a corporation. Chevrolet West, not Stevinson, is liable for its managers' discriminatory treatment of Berry.

### C. *Reynolds*

#### 1. *Title VII discriminatory discharge claim*

▮ Reynolds brings a claim for discriminatory discharge under Title VII. I found, however, that the gross profit per unit on Reynolds' sales was well below that of his predecessor and the Toyota regional sales average. Toyota West management periodically discussed these low gross profit figures with Reynolds. His gross profit per unit figures showed no improvement. Toyota West terminated Reynolds' employment because of his low gross profit per unit sales figures. I am not persuaded that this legitimate reason for his discharge was pretextual. Accordingly, Reynolds has not proven his Title VII discriminatory discharge claim.

#### 2. *Title VII retaliation claim*

#### a. *Liability*

▮ Under Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3(a). I use the *Burdine* shifting burdens analysis to determine whether Reynolds proved his Title VII retaliation claim. *Love v. RE/Max of America, Inc.,* 738 F.2d 383, 385 (10th Cir.1984). Here a *prima facie* case of retaliation is proven if Reynolds establishes that: (1) he filed an EEOC complaint; (2) Stevinson and Toyota West took adverse action against him after or contemporaneous with the filing of the EEOC complaint; and (3) there is a causal connection between Toyota West's and Stevinson's adverse action and Reynolds' filing of his EEOC complaint. *See Love,* 738 F.2d at 385.

▮ There is no causal connection between Denver West Bank and Trust filing claims against Reynolds and the filing of Reynolds' EEOC complaint. Thus, Reynolds has not established a *prima facie* case of retaliation to the extent this claim is premised on Denver West Bank and Trust's civil action.

▮ My conclusions differ, however, as to Reynolds' primary claim that Toyota West and Stevinson retaliated against him for filing his EEOC complaint by causing Szekula to report the alleged forgery to the sheriff's office which in turn lead to his theft and forgery prosecution. It is undisputed that Reynolds filed his EEOC complaint on March 1, 1990. Under the facts and circumstances of this case I conclude that Toyota West and Stevinson caused Szekula to report the purported forgery because Reynolds filed his EEOC complaint. Finally, that adverse action would not have occurred but for Reynolds filing his EEOC complaint.

▮ The burden then shifts to Toyota West and Stevinson to articulate a legitimate reason for their adverse action. *Love,* 738 F.2d at 385 (quoting *Burrus v. United Telephone Co.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982)). They need not prove the absence of retaliatory motive, but only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason. *Id.* Toyota West and Stevinson advance no legitimate reason for their actions. As a matter of fact they deny they played any role at all in causing Szekula to report the alleged forgery. In this regard I previously found the pivotal facts in favor of Reynolds and against these defendants. The timing and circumstances under which Szekula complained to the sheriff's office persuade me that Stevinson and Toyota West prompted Szekula to file the criminal charges in retaliation for Reynolds filing his EEOC complaint. These defendants fail to carry their burden of proving a legitimate reason for causing Szekula to report the alleged forgery. Accordingly,

Reynolds has proven the elements of his Title VII retaliation claim.

■ Nevertheless, relying on *Polsby v. Chase*, 970 F.2d 1360 (4th Cir.1992) defendants argue that Title VII provides no cause of action against a former employer by an ex-employee for acts of retaliation after the employment has ended. In *Polsby* the Fourth Circuit stated that:

> Title VII provides no cause of action against a former employer by an ex-employee for acts of retaliation after the employment has ended. Section 2000e–3(a) states:
>
> > It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a) (1982).
>
> The statute specifically indicates that it is unlawful for an employer to retaliate against an employee or an applicant for employment. No mention is made of former employees. Given that Congress considered it necessary to add applicant for employment as a person distinct from an employee to be protected from retaliation, Congress could certainly have also included a former employee if it had desired.
>
> Furthermore, the type of practices which are forbidden are those particularly related to employment. Specifically, unlawful employment practice is defined in part as the failure or refusal to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1) (1982). The definition comprises discrimination with respect to certain aspects of employment. Title VII does not redress discriminatory practices, however unsavory, which occur after the employment relationship has ended. As we have stated, Title VII is not a bad

acts statute. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir.1989).

*Polsby*, 970 F.2d at 1365, (internal quotes and footnote omitted).

The Fourth Circuit recognized in *Polsby* that the majority of the circuits addressing the issue have interpreted "employee" to include a former employee. Indeed, binding Tenth Circuit authority squarely holds that 42 U.S.C. § 2000e–3(a) protects a former employee. *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1165 (10th Cir.1977). The Tenth Circuit has eschewed "a literal reading of the statute which, if followed, would result in a narrow interpretation of the statute not justified by its legislative history. A statute which is remedial in nature should be liberally construed". *Id.*

*Rutherford* is arguably distinguishable from the facts of this case because Rutherford lost a job with a third party employer which she would have received but for the former employer defendant's retaliatory conduct. *Rutherford*, 565 F.2d at 1165. In Reynolds' case there is no evidence that the adverse retaliatory action taken by Toyota West and Stevinson interfered with his employment relationship with any other employer. Thus, if these defendants' conduct, "however unsavory", is not an "unlawful employment practice", then Reynolds would have no claim for relief under the facts and circumstances of this case. *Polsby*, 970 F.2d at 1365. This distinction does not alter the result here.

The anti-retaliation provision of Title VII prohibits discrimination against an employee for filing an EEOC complaint. 42 U.S.C. § 2000e–3(a). By definition, retaliation is discrimination under that section. Title VII's general anti-discrimination provision prohibits discrimination "... against any individual with respect to his compensation, terms, conditions, or privileges of employment ...". 42 U.S.C. § 2000e–2(a)(1). Title VII's general anti-discrimination provision thus relates to discrimination in employment matters. However, the purpose of Title VII's anti-retaliation provision "is to protect an employee who utilizes the tools provided by Congress to protect his

rights". *Vasconcelos v. Meese,* 907 F.2d 111, 113 (9th Cir.1990); *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir.1989). Title VII's broad anti-retaliation provision prohibits any retaliation against even a former employee who has filed an EEOC complaint. *Rutherford,* 565 F.2d at 1165. Congress' intent of protecting EEOC complainants from retaliation is furthered when all forms of retaliation, not just those related to employment, are cognizable under section 2000e–3(a). And, *Rutherford* teaches a liberal reading of this remedial statute. I hold, therefore, that retaliation against a former employee for filing an EEOC complaint is an actionable unlawful employment practice under Title VII's anti-retaliation provision regardless of whether it interferes with an employment relationship. Having concluded that Reynolds' retaliation claim is actionable under Title VII, I move to the analytically distinct issue of remedy. *See Franklin v. Gwinnett County Public Schools,* — U.S. —, —, 112 S.Ct. 1028, 1033, 117 L.Ed.2d 208, 217 (1992).

b. *Remedies*

 Title VII provides generally that where a defendant intentionally engages in an unlawful employment practice I may "... order such affirmative action as may be appropriate, which may include but is not limited to reinstatement or hiring of employees, with or without back pay ... *or any other equitable relief as the court deems appropriate.*" 42 U.S.C. § 2000e–5(g) (emphasis added). The remedy for retaliation, however, is severely limited. *See* 42 U.S.C. § 2000e–5(g) ("No order of the court shall require ... the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused employment or advancement or was suspended or expelled ... in violation of section 2000e–3(a)"). The standard Title VII remedies of reinstatement and back pay are unavailable to Reynolds. He may be entitled to any other equitable relief as I deem "appropriate" but can conceive of no equitable relief appropriate under the circumstances.

I cannot presume, however, that Reynolds has no remedy against Stevinson and Toyota West for their violation of his right to be free from discriminatory retaliation. Indeed, it would be a "monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist." *Kendall v. United States,* 37 U.S. (12 Pet.) 524, 624, 9 L.Ed. 1181 (1838). Unless Congress expressly indicates otherwise I presume that "where legal rights have been invaded and a federal statute provides for a general right to sue for such invasion I may use any available remedy to make good the wrong done." *Franklin,* — U.S. at —, 112 S.Ct. at 1032, 117 L.Ed.2d at 217 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). "The general rule, therefore, is that absent clear direction to the contrary by Congress, I may award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin,* — U.S. at —, 112 S.Ct. at 1035, 117 L.Ed.2d at 220.

 Reynolds' case, however, differs from *Franklin* in that Congress specified no remedies at all for a sexual harassment claim under Title IX. In contrast, Congress expressly provides some relief for a violation of Title VII's anti-retaliation provision. That relief is severely limited to "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g). But there is no appropriate equitable relief for Reynolds. No meaningful difference exists between a statute that is totally silent about the remedies available for its violation and one that provides a remedy that fails to redress a plaintiff's injury. Thus, *Franklin* controls my analysis of Reynolds' entitlement to legal remedies. Because the equitable relief specified by Congress inadequately redresses Reynolds' retaliation injuries, I hold that all appropriate remedies are available to compensate him for his injuries.

 The issue then is whether monetary damages are an appropriate remedy. *Franklin,* — U.S. at —, 112 S.Ct. at

137

1038, 117 L.Ed.2d at 223. Compensatory and punitive damages would redress Reynolds adequately for the injuries he suffered as a result of the defendants' retaliation. Furthermore, because such acts were intentional, money damages are appropriate. *Franklin,* —— U.S. at ——, 112 S.Ct. at 1038, 117 L.Ed.2d at 223. Accordingly, I conclude that compensatory and punitive damages are available to Reynolds on his Title VII retaliation claim to compensate him for all damages proximately caused by defendants' retaliation.

■■■ Reynolds is entitled to $250,-000.00 for the extreme emotional distress, suffering, embarrassment, humiliation, loss of reputation, standing in the community, and other hardship I found he experienced as a proximate result of Toyota West's and Stevinson's retaliation. He expended $15,-000.00 in legal fees and costs in defending against the theft and forgery charges. He would not have had to pay this amount had Toyota West and Stevinson not caused the initiation of the theft and forgery complaint. He is therefore entitled to $265,-000.00 as compensatory damages.

■■ I decline, however, to award punitive damages on Reynolds' retaliation claim. When punitive damages are available for a violation of a federal civil rights statute they may be awarded only when the discrimination is malicious, willful, and in gross disregard of the plaintiff's rights. *Jackson v. Pool Mortgage Co.,* 868 F.2d 1178, 1181 (10th Cir.1989). I am not persuaded that Stevinson or Toyota West maliciously, willfully, and in gross disregard of Reynolds' rights encouraged Szekula to report the alleged forgery. Reynolds presented no persuasive evidence that this retaliation was malicious, willful, or in gross disregard of his rights. Accordingly, Reynolds has not proven that punitive damages are warranted here.

Accordingly, IT IS ORDERED that

(1) Carter's Title VII claims are dismissed with prejudice and judgment shall enter in favor of Mark Toyota and Stevinson against Carter on his Title VII claims;

(2) judgment shall enter in favor of Berry on his Title VII claim and claim under 42 U.S.C. § 1981 against Chevrolet West in the amount of $72,822.00. Judgment shall enter in favor of Stevinson against Berry on Berry's Title VII claim and claim under 42 U.S.C. § 1981;

(3) judgment shall enter in favor of Toyota West and Stevinson against Reynolds on his Title VII discriminatory discharge claim; and

(4) judgment shall enter in favor of Reynolds on his Title VII retaliation claim against Toyota West and Stevinson for $265,000.00.